# SUMMONS ISSUED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X

UNITED STATES OF AMERICA, *ex rel.,*
STATE OF NEW YORK, *ex rel.,*
WILLIAM J. ROLD,



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 3 0 2011 ★
BROOKLYN OFFICE

CV 11 - 6374

                         Plaintiffs,

                      v.

RAFF & BECKER, LLP; DAVID A. RAFF,
ROBERT L. BECKER, M. PATRICIA SMITH,
LEONARD D. POLLETTA, and
ANDREW M. CUOMO,

                         Defendants.

COMPLAINT
FILED UNDER SEAL

No. 11 Cv. _____

Filed Under Seal
Pursuant to
31 U.S.C. § 3730(b)(2)

Jury Trial Demanded

-------------------------------------------------------------- X

IRIZARRY, J.
POHORELSKY, M.J.

## COMPLAINT

### INTRODUCTION

This is a hybrid complaint with *qui tam* and civil rights claims. The lawsuit concerns greed, corruption and retaliation, whose victims are the taxpayers and the unemployed of New York and the judge who was removed for trying to help them. For three decades, with the complicity of high state officials, a law firm has diverted federal and state money from hearings on current unemployment claims

1

designed to benefit the unemployed to churn due process litigation about such hearings ("Due Process Litigation") for their profit. As a result, New York has an extremely poor timeliness record in deciding unemployment cases, while the law firm has received millions of dollars in attorneys' fees.  In 2010, defendants took steps to perpetuate and conceal this arrangement indefinitely, and they had William J. Rold, the judge who tried to stop them, dismissed. This lawsuit seeks remedies for false claims under *qui tam* laws, including treble damages, and declaratory and injunctive relief and damages for violation of plaintiff's civil rights.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction of this case under 28 U.S.C. §§ 1331, 1343, 1345 and 2201; and under 31 U.S.C. § 3732(a).   It also has supplemental jurisdiction under 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

2.      Venue is proper in the Eastern District of New York under   28 U.S.C. § 1391, because all defendants do business there, and a substantial part of the transactions at issue occurred there.

## PARTIES

**Plaintiffs**

3.      Plaintiff, UNITED STATES OF AMERICA ["USA"], brings this action

through *qui tam* relator, WILLIAM J. ROLD, for all remedies under the False Claims Act, 31 U.S.C §§ 3729, *et seq.*, as amended, on behalf of the United States, for diversion of its grant money for unemployment compensation under the Social Security Act.

4.     Plaintiff, STATE OF NEW YORK ["NYS"], brings this action through *qui tam* relator, WILLIAM J. ROLD, for all remedies under the New York False Claims Act, Article XIII of the State Finance Law, §§ 187, *et seq.,* as amended, on behalf of the State of New York, for diversion of its appropriations for unemployment compensation under the Labor Law, for common law unjust enrichment, and for payment of unreasonable attorneys' fees under the Public Officers Law.

5.     Plaintiff, WILLIAM J. ROLD ["Rold"] is a resident of Brooklyn, New York. He was the Chief Administrative Law Judge of the New York State Unemployment Insurance Appeals Board ["UIAB"] and key agent of the Government Defendants until they removed him from office. He sues as *qui tam* relator and for violation of his constitutional, statutory, and civil rights.

**Law Firm Defendants**

6.     Defendant, RAFF & BECKER, LLP ["Raff & Becker"], is a limited liability New York professional partnership representing classes of unemployment

3

compensation claimants. It is a small law firm, and its receipt of the *qui tam* money in the Due Process Litigation is a substantial part of its annual income. The Due Process Litigation consists of *Barcia v. Sitkin*, 79 Civ. 3831 (RJC)(S.D.N.Y.); and *Municipal Labor Committee v. Sitkin*, 79 Civ. 5859 (RJC)(S.D.N.Y.) [the "Due Process Litigation" hereafter].

7. Defendants, DAVID A. RAFF and ROBERT L. BECKER ["Raff" and "Becker," respectively], are New York attorneys and partners in Raff & Becker. They have been personally involved in the Due Process Litigation and the violation of Rold's rights. They have billed tens of thousands of dollars for attorneys' fees each month for their time and benefitted personally from their unlawful conduct.

8. The Law Firm Defendants conspired with the Government Defendants to conceal their *qui tam* violations and the retaliation against Rold.

**Government Defendants**

9. Defendant, M. PATRICIA SMITH ["Smith"], was the Commissioner of the New York State Department of Labor, hired Rold and dismissed him from office. She is currently the Solicitor of the United States Department of Labor ["USDOL"].

10. Defendant, LEONARD D. POLLETTA ["Polletta"], is the Chair of the

4

New York State UIAB.  He was personally involved in imposing a hostile work environment on Rold and in removing him from office.

11.    Defendant, ANDREW M. CUOMO ["Cuomo"], is the Governor of the State of New York.  During most of the time covered by this Complaint, he was the New York State Attorney General.  As Attorney General, he was complicit in the violations herein and responsible for presenting attorneys' fees claims to the New York State Comptroller for payment to Raff & Becker.  As Governor, he has failed to grant Rold relief against retaliation.

12.    The Government Defendants are sued in their official and individual capacities.  They conspired with the Law Firm Defendants to conceal the *qui tam* and other violations herein and to retaliate against Rold.

## FACTUAL ALLEGATIONS

### Rold's Background and Entry into New York State Government

13.    Rold is an attorney licensed to practice in the State of New York and a 1977 graduate of Georgetown University Law Center.

14.    Rold has extensive background in litigation of federal class action public benefits cases. He was an attorney at the Center on Social Welfare Policy & Law, a Legal Services Corporation "back-up" office for national work on income

5

maintenance cases.

15.     Rold was also an attorney at the Prisoners' Rights Project, where he specialized in class action litigation and complex structural injunctions covering civil rights violations.

16.     Rold had a solo private practice in New York City for sixteen years, when he specialized in employment law and civil rights.  He handled federal class action litigation and consulted with numerous levels of government on compliance with regulatory injunctions.

17.     Rold has litigated attorneys' fees claims in class action and individual civil rights cases, and he has received them at public interest law firms and in his own practice.

18.     After the election of Eliot L. Spitzer as Governor of New York, Rold applied for service in state government.  He was approached by Defendant Raff, who said he was reviewing resumes for the new Governor.   Raff recommended Rold's interview with Defendants Smith and Polletta for the position of Chief Administrative Law Judge of the UIAB ["Chief ALJ"].

19.     Defendants Smith and Polletta asked Rold to meet with Defendants

6

Raff and Becker at their law firm. A substantial part of the discussion between Rold and the Law Firm Defendants concerned the Due Process Litigation. The Law Firm Defendants communicated their approval of Rold's hire to the Government Defendants.

20.    Defendants Smith and Polletta selected Rold to be Chief ALJ of the UIAB, and they informed Rold that his expertise in litigating and negotiating compliance with federal class action injunctions was a substantial reason for his selection.

21.    Rold's written job description, confirmed in his meetings with Defendants Smith and Polletta, provided that he would be general counsel to the UIAB and a key advisor in litigation. A primary mission would be to achieve compliance with the injunctions in the Due Process Litigation and end it.

22.    Defendant Polletta was selected to be Chair of the UIAB at about the same time as Rold was hired as Chief ALJ. Defendant Polletta's appointment was similarly vetted by the Law Firm Defendants.

23.    Rold closed his private practice of sixteen years to accept the position of UIAB Chief ALJ. He took office in September of 2007, after approval by the Governor's Office.

7

**The Unemployment Compensation Program and its Financing**

24.   Congress enacted the Federal-State Unemployment Compensation Program in the Social Security Act of 1935 to provide temporary wage replacement for involuntarily unemployed workers and to stabilize the economy during recessions.

25.   While the moneys for payment of benefits are subject to a complex federal-state funding formula (which varies by type of unemployment compensation benefit), under Title III of the Social Security Act, the federal government pays grants to the states to cover 100% of the cost of administration of the unemployment compensation program.

26.   To qualify for federal money for unemployment compensation administration, the states' unemployment compensation programs must pay benefits to eligible claimants "when due" and provide hearings for disputed claims.   Federal money pays for compliance with these provisions, including salaries for judges and support personnel and overhead.

27.   The United States Department of Labor oversees the system, and unemployment compensation administration must be approved by the USDOL to qualify for federal funds.   USDOL monitoring includes tracking the timeliness of

unemployment compensation fair hearing decisions and appeals.  New York has been under USDOL special scrutiny for untimely hearings and appeals.

**Unemployment Compensation Fair Hearings Administration in New York**

28.      Unemployment compensation is administered by the New York State Department of Labor.  Claimants who are dissatisfied with a decision on their claim may request a fair hearing before the UIAB.  In the year before Rold's appointment, about one in four of the claimants denied benefits requested a fair hearing.

29.      The UIAB is composed of a Chair and four other members appointed by the Governor of New York for staggered fixed terms.  Decisions in fair hearings are determined initially by a single administrative hearing judge of the UIAB.

30.      During Rold's tenure as Chief ALJ, there were approximately 15 teams of hearing judges, composed of 4-5 judges per team throughout New York State.  The teams were supervised by senior hearing judges.  This group is called the lower authority.

31.      Claimants can appeal the hearing judges' decisions to the UIAB.  About 10% of the adverse decisions are appealed.

32.      At this appellate stage, an appeal summary is written by a UIAB

appeals judge, for review and decision by two members of the UIAB. The appeals judges work in Albany and are supervised by senior appeals judges. This group is called the higher authority.

33.   The higher authority can affirm or reverse the decision, or it can remand the case for new findings or for more evidence. It can keep jurisdiction of a remanded case or send the case back for a new decision and possible new appeal.

34.   Although all five members of the UIAB can decide an appeal, the UIAB typically used two member panels for decisions. The panel decision is the final action on the claim for unemployment compensation.

35.   Judicial review of UIAB decisions is available by petition to the Appellate Division of the Supreme Court for the Third Department. UIAB decisions are sustained if supported by substantial evidence.

36.   All senior judges are supervised by principal judges. When Rold was appointed Chief ALJ, all principal judge positions were vacant. During Rold's tenure as Chief ALJ, there were 2-3 principal judges. The Chief ALJ supervises the principal judges, and through them all hearings and appeals judges and senior judges of both authorities.

37.     The Chief ALJ and the principal judges are management/confidential employees of the UIAB. Their hiring and retention in office are subject to approval of the Governor and the New York State Commissioner of Labor.

38.     Compliance with the injunctions in the Due Process Litigation was dependent on the judges under Rold's supervision. Their performance requires sufficient resources to render fair decisions in a timely manner.

**The Federal Class Action "Due Process Litigation"**

39.     The Law Firm Defendants brought two class action cases about the due process rights of claimants in unemployment fair hearings ("the Due Process Litigation"). Named defendants in both included the Commissioner of Labor and the Chair and Board Members of the UIAB.

40.     The parties settled the cases by consent decrees in the 1980's, and unemployment compensation fair hearings in New York are thus subject to structural injunctions. The injunctions provide claimants' protections, including: calling witnesses, cross-examination, development of an adequate record, and decisions based on the evidence.

41.     As Chief ALJ, Rold was the parties' principal agent for supervision of

hearings and the operational link between the UIAB Board Member defendants and the individual judges whose delivery of due process determined compliance with the injunctions. He was bound by the injunctions under F.R.C.P. 65(d)(2).

42.     The Law Firm Defendants have monitored Due Process Litigation injunction compliance for nearly 30 years. They receive a sampling of higher authority decisions and case records to review. The sampling does not include decisions and files of the lower authority that were never appealed.

43.     Compliance review involves a checklist of due process criteria applied by the higher authority to the decisions and hearing conduct of the lower authority judges. The checklist incorporates the provisions of a treatise on administrative hearings ["the Naftalison Manual"] and requires compliance with all of its provisions.

44.     The Law Firm Defendants maintain data on adherence to the due process items in the checklist. The data have been a continuing source of disagreement in the Due Process Litigation.

45.     The Law Firm Defendants maintain an office on the premises of the UIAB, participate in training of UIAB judges, and review proposed changes to UIAB policy impacting the consent decrees. They also write letters about UIAB appeal

12

decisions in individual cases. The letters are sent to the UIAB Chair, the Chief ALJ, and the Attorney General.

**The Law Firm Defendants' "Raff & Becker Letters"**

46.    The Law Firm Defendants write letters in individual cases after reviewing sample files from the higher authority. A typical letter about an individual claim appealed to the UIAB runs 6-8 single-spaced pages ["Raff & Becker letters"]. Raff & Becker bill usually bill three to four thousand dollars per letter.

47.    The Law Firm Defendants write 8-10 letters each month, or more than 100 letters per year. During the course of the Due Process Litigation, there have been several thousand letters.

48.    The Due Process Litigation requires a timely response to each letter by administrative law judges. Responses entail review of the entire claims file and many hours of judges' time. An efficient judge can decide three current disputed claims in the time it takes to respond to one Raff & Becker letter on an old case. These are usually sent out over the signature of the principal judge or the chief ALJ. Nearly always, a response generates another Raff & Becker letter on the same claim and another response.

13

49.     When Rold was Chief ALJ, there was a backlog in responses to Raff &

Becker letters. The Law Firm Defendants agreed to relax enforcement of the

letters' time deadlines, but there was continuous pressure to address them, and

new letters arrived every week.

50.     During the course of the Due Process Litigation, Raff & Becker letters

evolved from complaints about core due process issues to assertions that

decisions were not supported by substantial evidence.  This general principal of

administrative law was brought into the Due Process Litigation as a checklist item

because the Naftalison Manual (incorporated into the injunction) referred to it.

51.     Substantial evidence is the same standard applied in state court when

the Appellate Division reviews UIAB decisions.  The Law Firm Defendants

attempted to make the substantial evidence test part of injunctive compliance and

turn every dispute on the substance of a claim into a potential issue of contempt.

52.     Although the District Court rejected this use of substantial evidence

theory as compliance monitoring and held that "the proper avenue for

reconsideration of the substantive result in individual cases about which there has

been a dispute in the past is in the state appellate court," *Barcia v. Sitkin*, 2007

WL 222003 (S.D.N.Y. , June 25, 2007, Slip Copy at 9), the Law Firm Defendants

14

continued to write Raff & Becker letters alleging substantial evidence non-compliance.

53. The Raff & Becker letters mostly diverted judges' time and generated attorneys' fees (see below). They did not serve as a useful tool for monitoring compliance.

**The Due Process Initiative and Development of an Amelioration Plan**

54. When Rold took office as Chief ALJ, Defendants Smith and Polletta's predecessors in office had been held in contempt by the District Court for violation of the Due Process Litigation injunctions, primarily because of a failure to present a plan to ameliorate violations compiled from the checklist data by the Law Firm Defendants. The development of an "Amelioration Plan" occupied a substantial portion of Rold's first year as Chief ALJ.

55. Working with Defendants Smith and Polletta, Rold established a Due Process Initiative, designed to promote due process. Judges' workloads were reduced, and a systematic effort was undertaken to mentor and train them.

56. An additional goal of the Due Process Initiative was to reduce checklist violations. The Due Process Initiative would become a Memorandum of Understanding with the Law Firm Defendants that would achieve compliance with

the injunctions, purge the Government Defendants of contempt, and lead to disengagement from federal court oversight and sunset of the litigation.

57.     The Government Defendants did not provide sufficient resources to execute the Due Process Initiative. Instead, Rold and Defendant Polletta, with Defendant Smith's support, began negotiations with the Law Firm Defendants on an Amelioration Plan.

58.     In negotiations, the Government Defendants sought procedural reforms to institutionalize the due process changes required by the District Court's existing orders. The Law Firm Defendants wanted additional orders mandating increased adversary auditing, access to more documentation, and production of data from which to profile individual judges.

59.     If negotiations failed, Rold and the Government Defendants planned to ask District Judge Carter, who was no longer actively overseeing the Due Process Litigation, to refer compliance matters and contempt issues to a magistrate judge for active supervision.  Submission of competing drafts of a proposed Amelioration Plan to a magistrate judge was widely discussed at various meetings with the Government Defendants and others.

60.     Negotiations continued through 2008, at which time, Defendants

16

Smith and Polletta presented Rold with a Management/Confidential Merit Award for "exceptional commitment and dedication to the Department of Labor... rebuilding and strengthening the capacity of the UIAB to deliver fair hearings."

61. By 2009, Defendant Polletta, who had been filling an unexpired term of a former UIAB board member, had been appointed to a full six-year term as UIAB Chair. Barack Obama had been elected President of the United States and had nominated Defendant Smith to be Solicitor of USDOL.

62. The Government Defendants were no longer interested in the Court's involvement in developing an Amelioration Plan. The Government Defendants told Rold that an agreement was going to be reached between the parties to the Due Process Litigation without a magistrate judge referral.

**Subjecting Rold to a Hostile Work Environment**

63. In 2009, the Law Firm Defendants proposed an elaborate and costly Amelioration Plan, calling for increased auditing and oversight of unemployment compensation operations. Rold continued to resist such modification of the injunctions, because it would take increased resources from judges' hearing time, when hearing delays were already excessive and growing, and rejected

17

unemployment claimants waited increasingly longer times for review of their cases.

64.    With the assistance of the principal judges, Rold documented in time studies the diversion of resources from hearings to litigation activities entailed by the Law Firm Defendants' proposals. Defendant Polletta now insisted that the proposals would not divert resources.

65.    As a result of Rold's opposition to the Law Firm Defendants' proposed Amelioration Plan, Defendant Polletta began to subject Rold to an increasingly hostile work environment.      On information and belief, Defendant Polletta calculated the hostile work environment to force Rold to resign as Chief ALJ.

66.    The hostile work environment included:

-- berating and demeaning Rold at meetings before UIAB Board Members and Rold's subordinates;

-- insisting on advance review of all Rold memoranda as Chief ALJ, regardless of how routine;

-- demanding that Rold clear all responses to questions from Board Members with Polleta;

-- directing Rold not to convey opinions on matters of budget, staffing,

18

litigation strategy or due process;

-- falsely informing Board Members that Rold was coercing his subordinates to support Rold's positions; and

-- asking Rold's subordinates to report on him.

67. One of Rold direct subordinates, Principal Judge Andrea Addison, requested reassignment from the executive suite in frustration. She had been humiliated by Defendant Polletta, and she had witnessed the growing hostile atmosphere he created.

68. Although Defendants Polletta and Smith had earlier supported the appointment of a third principal judge to supervise senior judges, they refused to authorize Addison's replacement. It was not reasonably possible for Rold to supervise the increasing numbers of senior judges with only two principal judges.

69. On information and belief, the Government Defendants deliberately gave Rold inadequate personnel to perform his duties. After Rold's removal from office, the Government Defendants promptly appointed a third principal judge.

70. Rold informed Defendant Smith of the hostile work environment in writing and in person. In Spring of 2009, she told Rold "you have a lot to learn"; and she never met with him alone again. No apparent action was taken.

19

71.    By the summer of 2009, Defendant Polletta was excluding Rold from budgetary discussions. He directed him not to communicate his objections to Defendant Smith or her deputies.

72.    The work place hostility was substantially caused by Defendant Polletta's objections to Rold's protected speech and whistle blowing and knowingly tolerated by Defendant Smith. It caused extreme stress and made it unreasonably difficult for Rold to perform his duties. This hostility is apparent in Defendants' handling of the Mammen Affair.

**The Mammen Affair**

73.    In late 2007 and early 2008, two appeals judges reported to Chief ALJ Rold that senior appeals judge Thomas Mammen was substantively changing their legal work, forging their signatures to the changes, and presenting them to UIAB Board Members as if they were signed by the authors. He also removed their original documents from the case files, as if they had never existed.

74.    Rold investigated the allegations and confirmed them to be true in at least eleven instances. He reported the forgeries to Defendants Polletta and Smith and asked that Mammen be terminated. Rold also recommended an investigation to determine how many other cases were affected.

20

75.     In most cases, Mammen's actions resulted in changes denying benefits to claimants.  Rold recommended the affected cases be reopened and the decisions corrected, irrespective of the outcome.

76.     Defendant Smith told Rold she feared the issue could "implode" on the Department and wanted it handle quietly. She did not want the matter to become public or a search conducted for additional cases.

77.     Rold responded that he had to document the problem, noting that some of these cases were before the Third Department, and he could not be a party to a fraud on the court. Defendant Polletta was present for these discussions.

78.     Rold prepared a detailed written report documenting the cases he found and the possibility of other ones.  He mailed the report to Defendant Smith and to the New York State Inspector General.

79.     Agents of the Department of Labor intercepted Rold's letter to the Inspector General.  Department of Labor General Counsel Maria Colavito sent an e-mail to Defendants Smith and Polletta, confirming that Rold's mail had been intercepted and rebuking Rold for writing the Inspector General.  She told Rold to turn over all of his files to Counsel's Office.

80. Rold arranged for the decisions in the cases before the Third Department to be withdrawn. Rold also copied the files before turning them over to Counsel's Office.

81. Exercising his First Amendment rights, and complying with his ethical obligations under the Code of Professional Responsibility, Rold filed a formal ethical complaint with the Third Department about Mammen's misconduct as an attorney. During a visit to Albany, Rold also hand-delivered a copy of the Mammen report to the Inspector General's Office.

82. After Rold insisted that Mammen no longer be permitted to handle cases, Mammen was assigned, with full pay, to "work" from home. In fact, he did not work, but he drew full salary. Rold was not permitted to hire a replacement senior judge.

83. During the next year, the Department of Labor "lost" key evidence, including some of the case files containing forgeries; and notes from one of the judges whose decisions were changed disappeared from the UIAB executive offices.

84. Despite Rold's warning directly to Defendants Smith and Polletta, the Government Defendants allowed the statute of limitations to expire on

disciplinary action against Mammen under the collective bargaining agreement. Rold continued to protest Mammen's occupying a "no show" supervisory job, while judges were critically needed because claimants' cases languished without review.

85.     In August of 2009, the Inspector General issued a public report, finding that Judge Mammen had altered UIAB documents, relying on the eleven instances Rold had identified. The Department of Labor issued a press release stating that action would be taken "on those cases known to be affected by Mammen's conduct... by a team of Principal Judges under the supervision of the Chief Judge."

86.     Claiming a conflict, Defendant Smith hired a private Albany law firm (Whiteman, Osterman & Hanna) to proceed against Mammen on what charges could still be brought. On information and belief, the initial retainer was $50,000; and the firm was hired to contain a potential scandal and to distance the Government Defendants from it.

87.     The partner assigned to the case contacted Rold, because she had not been given the Mammen records by the Department of Labor. With Rold's assistance from the copied files, she tried to reconstruct the events Rold had

23

documented.

88.     Judge Mammen was served with charges of violation of the Penal Law in those cases.  He was permitted to resign state employment with his pension in November of 2009.   He had received full pay without working for twenty months.

89.     Defendant Polletta instructed Rold never to discuss the issue.  The Government Defendants removed Rold from office shortly after Mammen resigned. On information and belief, no effort was ever made to investigate whether other cases altered by Mammen's misconduct existed.

90.     Based on Rold's misconduct complaint, the Third Department publicly censured Mammen for the misconduct later in 2010.    Index No. D-60-10. Mammen had retired from the practice of law.

**Excluding Rold from Development of the Amelioration Plan**

91.     Meanwhile, in the Amelioration Plan negotiations, the Law Firm Defendants increased their demands for more internal audits and other monitoring to occur in four escalating "Phases."  They also insisted that all changes be in the form of consent decree modifications enforceable by the Court.

92.     Rold documented the supervisory time of the principal judges that

24

would be needed to achieve compliance with the proposed Phases. He delivered a memorandum, signed by him and all three principal judges, to Defendant Polletta, warning that the unemployment compensation mission would be compromised under the proposed Amelioration Plan without a substantial infusion of resources.

93.     Thereafter, Defendant Polletta froze Rold out of any further negotiations with the Law Firm Defendants regarding the Amelioration Plan. Defendant Polletta continued to meet with them, alone.

94.     In November of 2009, after seeing a new draft of the proposed Amelioration Plan, Rold wrote:

> We do not have enough resources to make the promises in the Plan, and we surely do not have enough resources to carry them out.  The Plan, as fashioned, will assure that the litigation continues indefinitely with incremental improvements that are never sufficient to sunset the decree.

Rold objected to Defendant Smith and her deputy commissioners and to Defendant Polletta and the UIAB Board Members. He also informed them that Defendant Polletta was excluding him from the Amelioration Plan negotiations.

95.     Defendant Polletta told Rold, "I can't believe you had the nerve to send that memo to all those people." He threatened Rold's position as Chief ALJ

and warned him "not to take me on."

96.   The Law Firm Defendants enlarged their demands.   Exploiting the Court's request that the Government Defendants devise some limited means for assessing due process violations in lower authority cases that are not appealed, they insisted on receiving samples of full lower authority hearing files and proceedings for their analysis.

97.   The Law Firm Defendants also demanded audits of lower authority cases, asking that internal review of hearing judges' cases gradually increase to eight per judge per month by Phase IV – or 96 audits per judge per year – *or more than 4,600 audits per year*.   The Final Phase also called for four monthly audits of each appeals judge – another 1,200 audits per year.

98.   The Law Firm Defendants further requested the creation of a database on the checklist performance of each lower authority judge.   Rold pointed out that this would foster union and other opposition and could violate Civil Service Law.

99.   This is the first time in 30 years of Due Process Litigation that formal post-judgment discovery would extend to lower authority case files.   The proposal would expand the consent decrees beyond the modification limits defined by the

Court of Appeals in the law of the case. Rold objected to this expanded disclosure and the diversion of trial judge resources from hearing appeals and disruption of lower authority operations that it would cause.

100.  At this time, the UIAB had a current hearing backlog of about 17,000 cases.  The resources diverted to do the proposed audits could instead have reduced the backlog by one-third, if the judges were resolving new cases instead of reconsidering old ones.

101.  Rold wrote that the proposals would divert more judges' and supervisors' resources from actual conduct of hearings. It would focus future compliance questions on the failure to perform all of the audits, to answer all of the letters, and to comply with all of the other monitoring, rather than on the due process failures in actual cases to the detriment of unemployment claimants and the federal and state governments' resources.

## Changing Terms of Rold's employment and Removing Him from Office

102.  Defendant Polletta told Rold he had no business in litigation and that his job was solely to manage the judges.  He left a new job description on Rold's desk that omitted any reference to legal responsibilities or participation in litigation.  He said that commenting on the Amelioration Plan was no longer part

of Rold's job as Chief ALJ.

103. Rold met with the Law Firm Defendants during this time on issues relating to training and tried to discuss the Amelioration Plan with Defendants Raff and Becker, but they informed Rold that they could not discuss it substantively. Defendant Raff proposed that Rold seek other work, and he suggested some other job possibilities to him.

104. In December of 2009, Defendant Polletta showed Rold the "Final" Amelioration Plan he had negotiated with the Law Firm Defendants.   He said it was a "done deal."

105. Nevertheless, Rold, knowing that the UIAB could not perform the Amelioration Plan and that its adoption was contrary to the public interest, wrote detailed objections to the Government Defendants, including by name Defendants Smith and Polletta, and Defendant Cuomo's Deputy, June Duffy.   None of them responded or spoke to Rold about it.

106. Defendants Smith and Polletta removed Rold from office as Chief ALJ before he could present his objections in person and to prevent his having the chance to do so. On January 6, 2010, just days before the UIAB Board Members were to meet to discuss the new Amelioration Plan, Defendant Polletta called Rold

28

into his office with Defendant Smith's Personnel Director and told him he was relieved as Chief ALJ, effectively immediately.

107.   Defendant Polletta asked Rold to leave that day. Anything left behind would be sent to him. He cancelled Rold's computer password and took his keys.

108.   The Personnel Director told Rold that Defendant Smith had arranged for him to work for another three months in a bureau of the Department of Labor addressing issues involving undocumented workers. Rold would have no staff and no defined responsibilities.

109.   Rold pressed Defendant Polletta for an explanation, but he refused to give one, other than to say "it wasn't working out." Defendant Polletta asked Rold not to discuss his removal with anyone. He did not ask Rold about any work in progress.   He informed the entire UIAB staff of Rold's reassignment, without explanation.

110.   Rold's performance had been exemplary.   He was well-liked by his subordinates.   There is not one negative document in his personnel file.   The manner of his removal from office was stigmatizing.

111.   Rold's removal was caused primarily because of his vocal opposition to the adoption of the Amelioration Plan and his whistle blowing activity in other

areas, such as the Mammen Affair. These are matters of public concern.

112. Whether Rold's activities are viewed as part of his role as Chief ALJ or as the acts of a private citizen, the Government Defendants sought to chill his speech and his whistle blowing activity. They acted to silence him and to punish him.

113. Rold filed a grievance under Executive Order 42 after being relieved as Chief ALJ. Executive Order 42, which provides for grievance rights for management/confidential employees, was signed originally by Governor Nelson Rockefeller, on October 14, 1970. It has been re-issued by each successive Governor, including Governor David A. Paterson on June 18, 2008, and Defendant Cuomo on January 1, 2011.

114. The Department of Labor denied the grievance. It wrote that "based on dialogue with management and corresponding documentation," the decision to relieve Rold was "necessitated by disparate ideas regarding the direction, operation and goals of the organization and the management styles necessary to sustain UIAB operations and bring the organization in compliance with existing court mandates."

115. Rold filed a timely appeal of the denial of his grievance to the

Governor's Office of Employee Relations.    He asked for production of the "documentation."    The appeal was still pending when Defendant Cuomo took office as Governor. Defendant Cuomo has never produced the documentation or resolved the appeal.

**Rold's Damages**

116.    Rold was humiliated and embarrassed by his removal from office as Chief ALJ.  He continues to suffer stress.

117.    Prior to his removal from office, Rold was physically disabled by a deteriorating right hip, which had been injured in a prior motor vehicle accident. He had forced himself to work, despite the pain.

118.    Following his removal, Rold had a complete physical.  He saw an orthopedic surgeon, who diagnosed total right hip failure in urgent need of reconstructive surgery.

119.    On his surgeon's advice, Rold went on total disability, pending surgery.  Rold had surgery in August of 2010.  He has not yet been cleared to return to work.

120.    The removal of Rold from office as Chief ALJ precluded any attempt to accommodate his continued employment from home while he awaited surgery

31

and recovered from it. It still does, causing enormous lost income.

121. Rold lost accruals when he was removed from office. He has no health care credits available.

122 Because Rold was still in active status when he went on disability, he is officially on Medical Leave Without Pay. As such, he remains eligible for health insurance.

123. On at least three occasions since his removal, Rold's health insurance was terminated illegally and without notice. Rold learned of these terminations when he was telephoned by a provider whose claim was denied and when his prescription card "bounced." These terminations included all major medical, as well as outpatient, dental, optical, and prescription services.

124. Each time, the Department of Civil Service reinstated Rold's insurance. They informed him that officials at the Department of Labor initiated the termination of coverage. On information and belief, these terminations were further retaliation.

125. Rold is currently paying the full cost of his health insurance (at nearly $600/month) to maintain his coverage. Rold has been denied COBRA coverage because he was told he is still a state employee on leave and "no COBRA-

qualifying event has occurred."

126.  Rold's retirement pension was not vested when he was removed from office.  He is currently unable to obtain vesting or additional accruals.  Other benefits lost or at risk include life insurance and survivor's annuities.

127.  Rold's recovery from surgery has been prolonged by depression caused by his removal from office.  He sees a therapist weekly.

128.  Rold has been irreparably injured by defendants' combined actions. He has no adequate remedy at law that will make him whole for the damages caused by his dismissal, so his reinstatement is necessary.

**The Adoption of the Amelioration Plan**

129.  The Amelioration Plan was presented to the UIAB without opportunity for the board members (other than Defendant Polletta) to hear from Rold.  It was approved substantially as proposed (with the minor change of hearing judge audits reduced from 4,600 to 3,450 annually) without a formal vote.

130.  The Amelioration Plan was annexed to and incorporated into a Stipulation and submitted to the District Court without opposition. It was not electronically filed, although a hard copy is available upon personal visit to the closed case files.  There was no notice or opportunity to object afforded to the

class putatively benefitted that the consent decree was being modified.  On April 6, 2010, the Stipulation was approved and "So Ordered" by the Court.

131.   The Amelioration Plan does not benefit the class or the UIAB judges, whose resources will be diverted by it.  It benefits only the Law Firm Defendants in the form of endless opportunities to claim non-compliance, without permitting the UIAB time to take affirmative steps to improve speed of resolution of claims and enhance due process.   Through the Amelioration Plan, the Law Firm Defendants will be able to perpetuate the litigation indefinitely and divert enormous resources to their own purposes from the administration of unemployment compensation hearings.

132.   Since its adoption, delays have grown for claimants awaiting hearings. On information and belief, New York State has the worst timeliness rate for hearings in the nation, but it has not informed the USDOL that it agreed to an Amelioration Plan that substantially aggravated its delays.

133.   To try to reduce delays, the UIAB has put supervising judges, including principal judges, on routine calendar in an effort to cope with the lost hearing time from the diversion of resources from hearings.  This has further reduced its capacity to monitor due process.

34

134.   Benchmarks for the Phases of the Amelioration Plan have been repeatedly extended because of lack of resources. The Law Firm Defendants have consented to such extensions.

135.   On information and belief, at the higher authority, time pressures have resulted in a "Blitz System" in which appeals are presented summarily to a single UIAB board member for decision, in an effort to unclog the docket. Although the summary Blitz System necessarily diminishes due process, the Law Firm Defendants have not objected.

136.   The Law Firm Defendants have filed no court papers since the Amelioration Plan was adopted.  They have been silent, despite non-compliance with the Plan, increasing delays in hearings and appeals, and loss of capacity to administer the unemployment compensation program in New York.

**The Law Firm Defendants' Attorneys' Fees**

137.   On January, 6, 2010, the day Rold was removed from office, the Government Defendants agreed to pay the Law Firm Defendants $410,000 for attorneys' fees.  There was no notice or opportunity to object to the class, and the court "So Ordered" the Stipulation on March 10th.

138.   The Law Firm Defendants had previously received attorneys' fees as

35

prevailing parties under 42 U.S.C. § 1988. They also receive on-going attorney's fees for their monitoring, training, and oversight activities without those fees being notified to the class or even available on the on-line docket for public inspection and oversight.

139.   In 1984, after adoption of the initial consent decrees, the parties to the Due Process Litigation submitted a stipulation, to be "So Ordered" by the Court, agreeing that "a structure for post-judgment attorney's fees and costs is in the best interests of all parties." The Stipulation provided that the Law Firm Defendants would submit monthly statements and that the Government Defendants had ten days to object or the requested fees must be paid.

140.   The stipulation was still in effect during Rold's tenure as Chief ALJ more than twenty years later.  On information and belief, it remains in effect.

141.   Payment of the attorneys' fees under the stipulation was subject to "appropriate approvals under section 17 of the Public Affairs Law" [*sic:* "Public Officers Law"].  The attorneys' fees are not part of the budgets of the UIAB or of the New York State Department of Labor.  Instead, the money is contained in the budget appropriated for costs of litigation against the State of New York.

142.   In practice, the "approvals" of attorneys' fees under the stipulation

commences when the Law Firm Defendants send a statement to the New York Attorney General, who forwards it to the UIAB Chair and Chief ALJ of the UIAB for review, prior to submission of a standard voucher to the New York State Comptroller, as "back-up" for a check.

143.  During Rold's tenure, the Law Firm Defendants' statements typically requested $70,000-$90,000 per month in on-going fees.  For the eight years between 1995 and 2003, when aspects of the Due Process Litigation were considered by the United States Court of Appeals, the Law Firm Defendants received approximately $5.3 million in on-going attorneys' fees, primarily for their monitoring services. *Barcia v. Sitkin,* 367 F.3d 87, 94 n.8 (2d Cir. 2004). The so-called Amelioration Plan has inevitably increased those fees substantially, but no public record of them exists.

**Rold's Objections to the Law Firm Defendants' Attorneys' Fees**

144.  During his first month in office, Rold received a copy of the Law Firm Defendants' statement for attorneys' fees from defendant Cuomo's Office, with a request that Rold advise the New York Attorney General of any objections.  The billing covered three months prior to Rold's appointment.

145.  Rold declined to approve the statement, but he analyzed its

reasonableness based on his experience. He questioned the use of senior partner time for what had become routine work, billing for multiple attorneys working on the same project or attending the same meeting, inflated charges for travel (1.6 hours each for Defendants Raff and Becker to travel from 32nd & Park Avenue to Hudson and King Streets in Manhattan – about 20 blocks – for a total charge of $1,260), billing for proofreading, for overhead, and the like, all of which violate 42 U.S.C. 1988 jurisprudence.

146.   The statements billed thousands of dollars for numerous Raff & Becker letters.  They often involved the work of multiple attorneys on the same letter. Some of the work consists of review of short form affirmance decisions with a single operative sentence, billed upward from $540/hour.

147.   Defendants Raff and Becker nearly always both attend every meeting and bill for two attorneys' time. Some statements have four attorneys' time billed for a single "in house" meeting.

148.   The statements included charges for training UIAB judges.   Their statements for the months leading up to a training conference in October of 2007 amounted to tens of thousands of dollars, including three days' time for two attorneys to travel to and attend the entire conference and nearly $7,000 to

38

prepare presentation remarks that lasted about 20 minutes.

149. In over thirty years of civil rights practice, Rold had never seen such on-going claims for unreasonable attorneys' fees in public interest litigation, and the case law specifically prohibits it. Rold detailed his objections in memoranda to the Government Defendants. He met with Defendants Smith and Polletta about the matter and with defendant Cuomo's agent, Deputy Attorney General June Duffy.

150. Rold drafted a letter to the Law Firm Defendants about the reasonableness of their attorneys' fees claims. The Government Defendants prevented him from sending the letter.

151. When the next bill arrived with the same kind of claims, Rold documented his objections again. The Government Defendants again prohibited him from objecting.

152. Thereafter, Rold, as an attorney and officer of the court, refused to sign any certifications for fees for the Law Firm Defendants. On information and belief, they continued to be paid.

153. The Amelioration Plan offers numerous ways for the Law Firm Defendants to continue and increase their on-going attorneys' fees. Rold warned

about them in his memoranda in opposition.

154.   Through time billed to review of lower authority files, to write the Raff & Becker letters they will generate, to study the audits that are to be held, and to analyze the data on judges that are to be produced, the Law Firm Defendants easily can increase their million dollar a year windfall in on-going attorneys' fees. They have no incentive to do otherwise.

**F.R.C.P. 23 and its 2003 Amendments**

155.   Federal litigation depends on the adversary system. If the parties are in collusion, the system breaks down. Class actions pose particular problems.

156.   Federal Rule of Civil Procedure 23 has governed throughout the Due Process Litigation.   It required adequate representation as a prerequisite for certification – F.R.C.P. 23(a)(4) – and proceedings of notice and approval incident to any settlement or compromise – F.R.C.P. 23(e).   Here, injunctive non-compliance was found, contempt was imposed, and a settlement was reached – all without notice to the class.

157.   In 2003, Federal Rule of Civil Procedure 23 was amended to add new subsections (g) and (h) to regulate the conduct of class counsel. Subsection (g)(4) imposes a continuing duty that class counsel "fairly and adequately represent the

40

interests of the class." Subsection (h) has particular new duties incident to awards of attorneys' fees in class action litigation, including a formal motion under F.R.C.P. 54, notice to the class, opportunity to object, findings under F.R.C.P. 52, and (as Rold sought here) possible referral to a magistrate judge.

158.   The commentary to the amendments notes the "powerful influence" of attorneys' fees on the conduct of class counsel. It stresses the new formalities and provides that the Court "must ensure that the amount and mode of payment... are fair and proper... [e]ven in the absence of objections."

159.   The Law Firm and the Government Defendants colluded to conceal the ongoing payment of attorneys' fees and the $410,000 signing bonus. This could not have been achieved in a contested motion, or even if the Stipulations were presented for approval in compliance with Rule 23.

160.   There is a conflict of interest between the Law Firm Defendants' attorneys' fees and the protection of the class of unemployment claimants whose hearings are being delayed by the diversion of resources from hearing their cases to churning the litigation. F.R.C.P. 23 and its 2003 Amendments were designed to police this situation. The substantial modification of the regulatory injunction that occurred herein and the routine payment of on-going fees to monitor it are

inconsistent with the letter and spirit of the amended Rule 23.

161.    Rold attempted to involve the federal court in the development and approval of the Amelioration Plan.  Such involvement is contemplated by Rule 23 and its 2003 Amendments.  Rold was punished for his efforts to require the Law Firm Defendants to comply with Rule 23.

### *Qui Tam* **Allegations**

162.   On information and belief, there are no pending actions related to this action, nor is this suit based on facts underlying any pending action, within the meaning of the False Claims Act's "first to file rule," under 31 U.S.C. 3730(b)(5).

163.   This action is not precluded by any provision of the False Claim Act's jurisdictional bars, 31 U.S.C. 3730(e), *et seq.*  Rold is not a current or former member of the armed services, and the lawsuit is not against a member of the armed services arising out of such person's service in the armed forces.

164.   This action is not brought against a member of Congress, the judiciary or a senior executive branch official based upon evidence or information already known to the Government, nor are the allegations and transactions herein the subject of a civil suit or administrative proceeding in which the Government is

already a party, within the meaning of the False Claims Act.

165. Through his employment as Chief ALJ, Rold is the original source of the information alleged herein in that he has direct and independent knowledge of the information underlying the allegations. He is not basing the allegations on "public disclosure," nor has there been any such public disclosure, within the meaning of the False Claims Act.

166. By filing this action under seal, Rold is voluntarily providing the information herein to the government before filing his action publicly.

### CLAIMS FOR RELIEF

The allegations of the preceding paragraphs are re-alleged in each of the subsequent claims:

### First Claim

### (False Claims Under 31 U.S.C. § 3729(a))

167. The Law Firm Defendants' requests and demands for money and property from NYS as a grantee of the USA for administration of unemployment compensation are claims within the meaning of the False Claims Act.

168. By such claims, the Law Firm Defendants have knowingly caused NYS to divert resources unnecessarily from unemployment hearings to prolong the

Due Process Litigation and further their own profit, thereby causing false and fraudulent claims to be paid.

169.   The Law Firm Defendants have conspired to get such false and fraudulent claims paid. The Government Defendants are co-conspirators.

170.   By such conduct, the Law Firm Defendants have knowingly taken possession and control of property and money away from its lawful purpose, to be used to perpetuate the Due Process Litigation and continue to  augment their receipt of attorneys' fees.

171.   The diversion of grant resources from hearing of unemployment cases to perpetuate the Due Process Litigation has thwarted the purpose of Congress under Title III of the Social Security Act and has caused fraudulent benefit to the Law Firm Defendants and severe delays in timely decisions of unemployment cases in New York.

172.   By such conduct, the Law Firm Defendants are liable for violation of 31 U.S.C. § 3729.

## Second Claim

**(False Claims Under New York Finance Law, Article XIII, § 187, *et seq.*)**

173.   The allegations of the First Claim are re-alleged here.

44

174.   The Law Firm Defendants have made false claims under the New York Finance Law in two respects. By knowingly making unreasonable and fraudulent requests and demands of NYS employees and agents for money and property, they have:  (1) diverted resources designated for administration of unemployment compensation by the New York State Department of Labor and used them to churn the Due Process Litigation and further their own profit; and (2) received unreasonable attorneys' fees and costs under 42 U.S.C. § 1988 as plaintiffs' counsel in the Due Process Litigation.

175.   The allegations of the First Claim regarding the Law Firm Defendants' violation of 31 U.S.C. § 3729(a) also constitute a violation of the New York Finance Law False Claims provisions.

176.   The Law Firm Defendants' claims for attorneys' fees have been unreasonable under 42 U.S.C. § 1988 and the case law applying it.   The unreasonableness includes: rates, hours, multiple billing, inflated itemizations, and persistent churning of the Due Process Litigation to perpetuate ongoing fees.

177.   On-going fees have been awarded automatically based on the Law Firm Defendants' monthly statements, without presenting claims to the Court for

review, as required by Rule 23 of the Federal Rules of Civil Procedure.

178.   The Government Defendants have been complicit in passing the Law Firm Defendants' statements through to the New York State Comptroller for payment without scrutiny, and they instructed Rold to refrain from protesting, even though, as Chief ALJ, he refused to certify the claims. The Law Firm and Government Defendants have conspired and colluded to maintain a flow of fraudulent attorneys' fees in the Due Process Litigation and to conceal it from the public and the Court.

179.   When the 2010 Amelioration Plan was adopted over Rold's objections, a bonus award of attorneys' fees of $410,000 was paid to the Law Firm Defendants "on consent," although the Law Firm Defendants had not fully prevailed in past motions and appeal to the Second Circuit on which such fees were based.  Moreover, the class was not notified or provided with an opportunity to object to the fees.

180.   Through false claims for attorneys' fees, the Law Firm Defendants have, on information and belief, achieved an income of over a million dollars a year, with cumulative fees of millions of dollars for the Due Process Litigation.

181.   By such conduct, the Law Firm Defendants are liable for violation of

Article XIII of the New York Finance Law, § 187, *et seq.*

### Third Claim

### (Retaliation Under 31 U.S.C. § 3730(h))

182. Rold's actions to expose and end the false claims set forth in this lawsuit were protected activity under 31 U.S.C. § 3730(h).

183. In an attempt to silence and intimidate Rold, the Government Defendants subjected him to a hostile environment. In retaliation for his efforts to stop the Amelioration Plan and to prevent his exposing it, the Government Defendants threatened him, changed his job description, and removed him for office.

184. The Law Firm Defendants conspired with the Government Defendants in retaliating against Rold.

185. The Law Firm and Government Defendants violated 31 U.S.C. § 3730(h) by taking adverse personnel actions against Rold.

### Fourth Claim

### (Retaliation Under New York Finance Law, Article XIII, § 191)

186. The allegations of the Third Claim are re-alleged here.

187. The Law Firm and Government Defendants conspired to violate

47

and did violate New York Finance Law, Article XIII, § 191, by taking adverse personnel actions against Rold.

## Fifth Claim

### (Unjust Enrichment)

188.   The common law of unjust enrichment does not require wrongful conduct or fraud.

189.   The conduct of the Law Firm Defendants, with the collusion of the Government Defendants, has resulted in millions of dollars of unjust enrichment of the Law Firm Defendants at the expense of the taxpayers and the unemployed of New York.

190.   Defendants have violated the common law of unjust enrichment, for which they should be required to disgorge such riches.

## Sixth Claim

### (42 U.S.C. § 1983: Violation of Free Speech and Right to Petition the Government)

191.   Rold's actions in challenging the false claims and the due process violations in unemployment compensation administration were taken as Chief ALJ and as a private citizen.

192.   Rold's complaints to the New York State Inspector General and to the

48

Third Department of the Appellate Division in the Mammen Affair were taken as Chief ALJ, as a private citizen, and as an officer of the Court bound by the Code of Professional Responsibility.

193.   Rold's actions were protected by the First Amendment's guarantees of freedom of speech and the right to petition the government.  The matters about which he spoke and petitioned were of public concern in that they were about use of tax money, operation of unemployment compensation in New York, and the integrity of the Court.

194.   Under color of state law, the Government Defendants retaliated against Rold for exercise of his First Amendment rights by creating a hostile work environment, threatening him, changing his job description, and removing him from office.  Rold has been damaged by the loss of salary and benefits, emotional distress and damage to his professional reputation.

195.   The Law Firm Defendants conspired with the Government Defendants in such actions.  The actions were taken willfully and intentionally, justifying punitive damages.

## Seventh Claim

### (42 U.S.C. § 1983: Violation of Procedural
### And Substantive Due Process of Law)

196.   The Government Defendants retaliated against Rold and removed him from office without notice and in violation of his right to be heard.

197.   Defendant Cuomo has not ruled on his appeal under Executive Order 42, nor provided Rold with the documentation allegedly supporting the decision to remove him from office.

198.   Rold challenged diversion of unemployment compensation resources that interfered with compliance with existing court orders, and he opposed a proposed injunction that imposed impossible requirements under current appropriations.   Rold's actions were taken to defend himself against personal contempt under F.R.C.P. 65(d)(2) and under his First Amendment rights.

199.   Under color of state law, the Government Defendants deprived Rold of his right to procedural due process (by denying him reasonable notice and opportunity to be heard with access to underlying documents); and retaliated against Rold for exercise of his substantive rights to speech and petition (by creating a hostile work environment, threatening him, changing his job description, and removing him from office). Rold has been damaged by the loss of

salary and benefits, emotional distress and damage to his professional reputation.

200.   The Law Firm Defendants conspired with the Government Defendants in such actions.   The Government Defendants' actions were taken willfully and intentionally, justifying punitive damages.

## Eighth Claim

### (Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985(2), and Hinder and Delay the Execution of Federal Law)

201.   Rold is an agent of a party and a witness in the on-going Due Process Litigation.  The Government and Law Firm Defendants conspired to violate Rold's rights and to prevent him from attending and testifying about the Due Process Litigation in a matter pending in a federal court.

202.   The Government and Law Firm defendants excluded Rold from negotiations relating to the Amelioration Plan to prevent him from presenting his views to the UIAB Board Members or to the Court.   Each meeting of such defendants without Rold was an overt act in furtherance of this conspiracy.  Other overt acts included:   creating a hostile work environment, threatening him, changing his job description, encouraging him to resign, removing him from office,

51

and placing him in an obscure bureau of the Department of Labor after removal from office.

203.   Section 2 of 42 U.S.C. § 1985 is part of the Civil Rights Act of 1871, 17 Stat. 13, ch. 22. The uncodified full text of Section 2, never repealed, also prohibits conspiracies of "force, intimidation, or threat to prevent, hinder or delay the execution of any law of the United States."

204.   Unlike cases under many other reconstruction era civil rights laws, actions under 42 U.S.C. § 1985(2) and its additional uncodified provisions do not require color of state law or class/racial animus to be actionable.

205.   Defendants have conspired to violate civil rights and delay and hinder federal law, in violation of 42 U.S.C. § 1985(2) and 17 Stat. 13, ch. 22.  Rold has been damaged by the loss of salary and benefits, emotional distress and damage to his professional reputation.


## Ninth Claim

### (Family and Medical Leave Act, 29 U.S.C. § 2615, *et seq.*)

206.   The continuation of Rold's health insurance while he is on disability is protected by the Family and Medical Leave Act.  By three times terminating Rold's

health insurance without legal cause or notice, the Government Defendants have violated such Act.

207.  Rold is entitled to return to his former position at the conclusion of his disability or to the reasonable accommodation of working from home when able.

208.  Rold is entitled to continuation of his health coverage and to other declaratory and injunctive relief and damages, costs and attorneys' fees under the Family and Medical Leave Act, 29 U.S.C. § 2615, *et seq.*

## Tenth Claim

### (New York Constitution: Free Speech, Right to Petition, Due Process)

209.  The allegations of the Sixth and Seventh Claims are re-alleged here.

210.  Rold's actions were protected by § 8 (free speech), § 9 (petition for redress of grievances), and § 6 (due process) of Article I of the Constitution of the State of New York.

211.  The Government Defendants retaliated against Rold for exercise of his New York Constitutional rights by creating a hostile work environment, threatening him, changing his job description, and removing him from office. Rold has been damaged by such actions.

### Eleventh Claim

### (Breach of Contract)

212.  All of the individual parties to this lawsuit are attorneys and officers of the Court, bound by the Code of Professional Responsibility, which provides an exception to the "at will" employment doctrine in New York.  It creates a zone of protected activity for "at will" employees.

213.  Rold's reporting of violations of the law and of the Code of Professional Responsibility were protected activities, for which the Government Defendants, in collusion with the Law Firm Defendants, retaliated against him.

214.  Compliance with the Code of Professional Responsibility is implied in contracts for employment for lawyers in New York.

215.  The Government Defendants breached Rold's contract of employment.

### REQUEST FOR RELIEF

WHEREFORE, as Relator on behalf of the USA and NYS in the *qui tam* actions, and as plaintiff for himself, Rold requests that judgment be entered as follows:

A. On the First Claim, enter an order that the Law Firm Defendants cease and

desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* and

54

that the Government Defendants cease and desist from colluding in same; and enter judgment against the Law Firm Defendants for three times the damages sustained by the USA because of their actions, which amount is to be determined at trial or by the Court, plus interest, with statutory share to plaintiff/relator Rold; plus judgment for the maximum civil penalty allowed by law for each violation, with interest; plus judgment for costs, including attorneys' fees.

B. On the Second Claim, enter an order that the Law Firm Defendants cease and desist from violating the New York Finance Law, Article XIII, §§ 187 , *et seq.*, and that the Government Defendants cease and desist from colluding in same; and enter judgment against the Law Firm Defendants for three times the damages sustained by New York State because of their actions, which amount is to be determined at trial or by the Court, plus interest, with statutory share to plaintiff/relator Rold; plus judgment for the maximum civil penalty allowed by law for each violation, with interest; plus judgment for costs, including attorneys' fees.

C. On the Third Claim, enter an order under 31 U.S.C. § 3730(h) that the Law Firm and Government Defendants cease and desist from retaliating against

Rold and declaring and ordering his right to reinstatement, expungement of his record, and his entitlement to all prior benefits; and enter judgment for Rold in an amount twice his damages with interest, including back and front pay, and all benefits including health and retirement and special damages; plus judgment for costs, including attorneys' fees.

D. On the FourthClaim, enter an order under New York Finance Law, Article XIII, § 191, that the Law Firm and Government Defendants cease and desist from retaliating against Rold and declaring and ordering his right to reinstatement, expungement of his record, and his entitlement to all prior benefits; and enter judgment for Rold in an amount twice his damages with interest, including back and front pay, and all benefits including health and retirement and special damages; plus judgment for costs, including attorneys' fees.

E. On the Fifth Claim, enter a judgment finding that the Law Firm Defendants have been unjustly enriched under New York common law and requiring them to disgorge the unjust riches, with such other relief as is appropriate.

F. On the Sixth Claim, enter an order under 42 U.S.C. § 1983 that the

Government Defendants cease and desist from violating Rold's rights to free speech and petition the government and declaring and ordering his right to reinstatement, expungement of his record, and his entitlement to all prior benefits; his entitlement to back and front pay; plus judgment for compensatory and punitive damages and for costs, including expert witness and reasonable attorneys' fees.

G. On the <u>Seventh Claim</u>, enter an order under 42 U.S.C. § 1983 that the Government Defendants cease and desist from violating Rold's rights to procedural and substantive due process and declaring and ordering his right to reinstatement, expungement of his record, and his entitlement to all prior benefits; his entitlement to back and front pay; plus judgment for compensatory and punitive damages and for costs, including expert witness and reasonable attorneys' fees.

H. On the <u>Eighth Claim</u>, enter an order under 42 U.SC. § 1985(2) that the Law Firm and Government Defendants cease and desist from conspiring to violate Rold's rights as a agent of a party and a witness in federal court, and declaring and ordering Rold's rights to reinstatement, expungement of his record, and his entitlement to all prior benefits; his entitlement to back and

57

front pay; plus judgment for compensatory and punitive damages and for costs, including expert witness and reasonable attorneys' fees.

I.  On the <u>Ninth Claim</u>, enter an order under 29 U.S.C. § 2615, *et seq.*, that the Government Defendants cease and desist from violating Rold's rights under the Family and Medical Leave Act, and declaring and ordering Rold's rights to continuing benefits while on disability and return to employment at the conclusion of disability, and his entitlement to all other benefits; plus judgment for damages and for costs, including reasonable attorneys' fees.

J.  On the <u>Tenth Claim</u>, enter an order that the Government Defendants cease and desist from violating Rold's rights under the New York Constitution, Article I, §§ 6, 8, and 9, and declaring and ordering Rold's reinstatement with all benefits, and all other relief.

K.  On the <u>Eleventh Claim</u>, enter an order enforcing the Code of Professional Responsibility and declaring Rold's rights to relief for breach of contract under same notwithstanding his status as at "at will" employee, and ordering his reinstatement by the Government Defendants, with expungement of his record and all past benefits.

58

L. Grant such order or further relief as to this Court may seem just and proper

for the redress of the USA, NYS, or Rold.

**TRIAL BY JURY**

Plaintiff demands a jury trial under Rule 38 of the Federal Rules of Civil

Procedure.

San Juan, Puerto Rico
December 30, 2011

<div style="margin-left:40%">

**LAW OFFICES OF
JANE BECKER**
P.O. Box 9023914
San Juan, Puerto Rico 00902-3914
Tel. 787 754-9191
Fax 787 764-3101


/s/  JANE BECKER
**JANE BECKER (JB-6155)**

</div>

New York, New York
December 30, 2011

<div style="margin-left:40%">

**LAW OFFICES OF
STEVEN A. ROSEN**
271 Madison Avenue, Suite 1404
New York, New York 10016
Tel. 212-599-3970
Fax 212-599-3969

/s/  STEVEN A. ROSEN
**STEVEN A. ROSEN (SR-9913)**

</div>